| | |
|---|---|
| **LOUIS R. KOERNER, JR.** | **CIVIL ACTION** |
| **VERSUS** | **No. 16-13319** |
| **VIGILANT INSURANCE COMPANY** | **SECTION I** |

## ORDER AND REASONS

Louis R. Koerner, Jr. ("Koerner") owns a house on Jackson Avenue in New Orleans. On November 11, 2005, Koerner contracted with CMR Construction & Roofing, LLC ("CMR") to replace the house's slate roof.[1] The roof installed by CMR—a "Slate 2.0 roof"[2]—is at the center of the present dispute.

Koerner contends that he wanted to purchase what he labels a "traditional slate roof," that CMR knew the same, and that CMR led him to believe that the Slate 2.0 roof was a "traditional slate roof."[3] According to Koerner, a Slate 2.0 roof is not a "traditional slate roof," because CMR used a synthetic membrane instead of felt underneath the slate tiles.[4] Koerner alleges that he never would have purchased the Slate 2.0 roof had he known that it was not a "traditional slate roof," and had CMR

---

[1] *See* R. Doc. No. 81-2, at 9.
[2] *See id.*; R. Doc. No. 81-3; R. Doc. No. 85, at 2.
[3] *See* R. Doc. No. 85, at 2-3.
[4] *See* R. Doc. No. 111 ("Louis Koerner ('Koerner') confirmed that a basis of his fraud allegations related to his 2005 roofing contract with CMR is CMR's use of a synthetic membrane—rather than felt—under the slate tiles, which does not constitute a 'traditional slate roof.'").

not made other representations to him regarding the quality of the roof and its advantages when compared to other available roofs.[5]

Further, Koerner argues that representations made by CMR when Koerner sought subsequent repair work on the roof caused him additional damage.[6] Koerner also contends that the overall quality of CMR's work—the removal of the old roof and installation of the new one, as well as the remedial work—was shoddy.[7] Based on these allegations, Koerner asserts numerous Louisiana law claims against CMR, including breach of warranty, breach of contract, rescission of contract, detrimental reliance, redhibition, negligence, and fraud.[8]

CMR has now moved for summary judgment, arguing that most of Koerner's claims are perempted.[9] CMR also contends that it is entitled to summary judgment on Koerner's remaining claims, which relate to repair work performed on his Jackson Avenue house's roof in 2012.[10] Further, CMR argues that Koerner's fraud claims are prescribed.[11]

## I.

Summary judgment is proper when, after reviewing the pleadings, the discovery and disclosure materials on file, and any affidavits, the court determines that there is no genuine dispute of material fact. *See* Fed. R. Civ. P. 56. "[A] party

---

[5] *See* R. Doc. No. 85, at 3.
[6] *See id.* at 3-4.
[7] *See id.* at 3-5.
[8] *See* R. Doc. No. 24, at 3-6; R. Doc. No. 66.
[9] *See* R. Doc. No. 81-3, at 4.
[10] *See id.* at 8-10.
[11] *See id.* at 12-13.

seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The party seeking summary judgment need not produce evidence negating the existence of material fact, but need only point out the absence of evidence supporting the other party's case. *Id.*; *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1195 (5th Cir. 1986).

Once the party seeking summary judgment carries its initial burden, the nonmoving party must come forward with specific facts showing that there is a genuine dispute of material fact for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The showing of a genuine issue of material fact is not satisfied by creating "'some metaphysical doubt as to the material facts,' by 'conclusory allegations,' by 'unsubstantiated assertions,' or by only a 'scintilla' of evidence." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (citations omitted). Instead, a genuine issue of material fact exists when the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The party responding to the motion for summary judgment may not rest upon the pleadings, but must identify specific facts that establish a genuine issue. *Id.* However, the nonmoving party's evidence "is to be believed, and all justifiable inferences are to be drawn in [the nonmoving party's] favor." *Id.* at 255; *see also Hunt v. Cromartie*, 526 U.S. 541, 552 (1999).

Moreover, "[a]lthough the substance or content of the evidence submitted to support or dispute a fact on summary judgment must be admissible . . . , the material may be presented in a form that would not, in itself, be admissible at trial." *Lee v. Offshore Logistical & Transp., LLC*, 859 F.3d 353, 355 (5th Cir. 2017) (quoting 11 Moore's Federal Practice–Civil ¶ 56.91 (2017)). "This flexibility allows the court to consider the evidence that would likely be admitted at trial . . . without imposing on parties the time and expense it takes to authenticate everything in the record." *Maurer v. Independence Town*, No. 16-30673, 2017 WL 3866561, at *3 (5th Cir. Sept. 5, 2017).

## II.

CMR argues that peremption bars most of Koerner's claims. "Peremption is a period of time fixed by law for the existence of a right." La. Civ. C. art. 3458. "Unless timely exercised, the right is extinguished upon the expiration of the peremptive period." *Id.*; *see also Naghi v. Brener*, 17 So. 3d 919, 926 (La. 2009) (observing that "the cause of action no longer exists after the termination of the peremptive period and any right to assert the claim is destroyed"). "Peremption may not be renounced, interrupted, or suspended." La. Civ. C. art. 3461; *cf. Naghi*, 17 So. 3d at 925-26 ("Because the cause of action no longer exists after the termination of the peremptive period and any right to assert the claim is destroyed, there is nothing to which an amended or supplemental pleading filed after the peremptive period has expired can relate back.").

"Peremption may be pleaded or it may be supplied by a court on its own motion at any time prior to final judgment." La. Civ. C. art. 3460. As a general rule, "the

exceptor bears the burden of proof at the trial of the peremptory exception." *Rando v. Anco Insulations, Inc.*, 16 So. 3d 1065, 1082 (La. 2009). However, where peremption is "evident on the face of the pleadings," the burden shifts to the plaintiff to demonstrate that an action is not perempted. *Id.*

"Peremptive statutes are strictly construed against peremption and in favor of the claim." *Id.* at 1083. "Of the possible constructions, the one that maintains enforcement of the claim or action, rather than the one that bars enforcement should be adopted." *Id.*

When interpreting Louisiana law—including Louisiana's preemptive statutes—a federal court must heed the Louisiana Supreme Court's instructions regarding statutory interpretation. *See In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 206 (5th Cir. 2007). "[T]he starting point in interpreting any statute is the language of the statute itself." *Louisiana v. Johnson*, 884 So. 2d 568, 575 (La. 2004).

> The meaning and intent of a law is determined by considering the law in its entirety and all other laws on the same subject matter and by placing a construction on the law that is consistent with the express terms of the law and with the obvious intent of the legislature in enacting the law. A statute must be applied and interpreted in a manner that is logical and consistent with the presumed purpose and intent of the legislature.
>
> Further, it is presumed that every word, sentence, or provision in a law was intended to serve some useful purpose, that some effect is to be given to each such provision, and that no unnecessary words or provisions were employed. As a result, courts are bound, if possible, to give effect to all parts of a statute and to construe no sentence, clause or word as meaningless and surplusage if a construction giving force to, and preserving, all words can legitimately be found. Finally, it is presumed that the legislature acts with full knowledge of well-settled principles of statutory construction.

*Moss v. Louisiana*, 925 So. 2d 1185, 1196 (La. 2006) (internal citations omitted). Ultimately, "[t]he fundamental question in all cases of statutory interpretation" involving Louisiana law "is legislative intent." *Id.*

In addition to these jurisprudential principles, the Louisiana legislature has enacted specific rules governing the interpretation of Louisiana's revised statutes. *See generally* La. R.S. § 1. As relevant in this case, the legislature directs that "[w]ords and phrases shall be read with their context and shall be construed according to the common and approved usage of the language." *Id.* § 1:3. "Technical words and phrases, and such others as may have acquired a peculiar and appropriate meaning in the law, shall be construed and understood according to such peculiar and appropriate meaning." *Id.* "The word 'shall' is mandatory and the word 'may' is permissive." *Id.* Moreover, "[w]hen the wording . . . is clear and free of ambiguity, the letter of it shall not be disregarded under the pretext of pursuing its spirit." *Id.* § 1:4. Finally, "[u]nless it is otherwise clearly indicated, the word 'person' includes a body of persons, whether incorporated or not." *Id.* § 1:10.

With these rules of construction in mind, the Court turns to the peremption issue raised by CMR.

### III.

### A.

CMR's peremption argument focuses on La. R.S. § 9:2722, which the Louisiana legislature enacted in 1964 "to protect residential building contractors from liability for past construction projects that could extend for an indefinite period of time." *Thrasher Const., Inc. v. Gibbs Residential, L.L.C.*, 197 So. 3d 283, 290 (La. Ct. App.

4th Cir. 2016).  The current version of § 9:2722 became effective as of August 15, 2003, and so was in effect well before Koerner contracted with CMR to install a Slate 2.0 roof on his Jackson Avenue house.  *Metairie III v. Poche' Const., Inc.*, 49 So. 3d 446, 450 (La. Ct. App. 4th Cir. 2010).

Section 9:2772 provides, in pertinent part:

Except as otherwise provided in this Subsection, *no action*, whether ex contractu, ex delicto, or otherwise, including but not limited to an action for failure to warn, to recover on a contract, or to recover damages, or otherwise arising out of an engagement of planning, construction, design, or building immovable or movable property which may include, without limitation, consultation, planning, designs, drawings, specification, investigation, evaluation, measuring, or administration related to any building, construction, demolition, or work, *shall be brought . . . against any person performing or furnishing* the design, planning, supervision, inspection, or observation of construction or *the construction of immovables, or improvement to immovable property*, including but not limited to a residential building contractor as defined in R.S. 37:2150.1:

(1)(a) More than five years after the date of registry in the mortgage office of acceptance of the work by owner.

(b) If no such acceptance is recorded within six months from the date the owner has occupied or taken possession of the improvement, in whole or in part, *more than five years after the improvement has been thus occupied by the owner*.

La. R.S. § 9:2772(A) (emphasis added).  In other words, "actions involving deficiencies in surveying, design, supervision, or construction of immovables or improvements thereon" are subject to § 9:2772's five-year peremptive period.[12] *Thrasher Const.*, 197 So. 3d at 290.

---

[12] Among the causes of action that Louisiana courts have subjected to § 9:2772's peremptive period are breach of contract, breach of warranty, redhibition, products liability, and negligence.  *See Exxon Corp. v. Foster Wheeler Corp.*, 805 So. 2d 432 (La. Ct. App. 1st Cir. 2001).  Moreover, while Koerner argues that his rescission of contract

The peremptive period's trigger "is not dependent on the discovery of the defect." *Burkart v. Williamson*, 29 So. 3d 635, 639 (La. Ct. App. 1st Cir. 2009). Moreover, "any repairs or promises to repair alleged to have been made" do not interrupt the running of the § 9:2772 peremptive period. *Lasseigne v. Schouest & Sons, Builders*, 563 So. 2d 371, 373 (La. Ct. App. 1st Cir. 1990).

## B.

The parties first dispute whether the § 9:2772 peremptive period applies to claims arising from the underlying contract between the parties. As the Court previously explained, the dispute between CMR and Koerner centers on a 2005 contract in which CMR agreed to remove the Jackson Avenue house's old slate roof and install a new Slate 2.0 roof. Koerner contends that a genuine dispute of material fact exists as to whether this contract was a contract of sale or a construction contract.[13] If the contract was a contract of sale, as opposed to a construction contract, then § 9:2772's peremptive period is inapplicable. *See Swope v. Columbian Chems. Co.*, 281 F.3d 185, 201-02 (5th Cir. 2002) (quoting *KSLA–TV, Inc. v. Radio Corp. of Am.*, 693 F.2d 544, 545 (5th Cir. 1982) (per curiam)). CMR disagrees, contending that "a roof is an improvement to an immovable, or part of an immovable, as a matter of law"—and therefore the underlying contract obligating CMR to remove the house's old roof and install a new one is a construction contract falling squarely within the

---

claim is not prescribed, *see* R. Doc. No. 85, at 11, he does not challenge CMR's argument that the claim is perempted, *see* R. Doc. No. 81-3, at 5-7.

[13] R. Doc. No. 85, at 17.

purview of § 9:2772.[14] The parties do not dispute the work for which Koerner contracted with CMR: replacement of the roof of Koerner's Jackson Avenue house.

Louisiana law provides that "[t]racts of land, with their component parts, are immovables." La. Civ. C. art. 462. Buildings, such as houses, are "components parts" of the land and therefore are themselves immovables. *Id.* art. 463. "[A] new home construction on a vacant lot is an 'improvement to immovable property,'" and "it is equally the case that once such a home is built it becomes an immovable itself, and *any further construction*, be it a *renovation* or addition to the home, is likewise an 'improvement to immovable property.'" *Dugas v. Cacioppo*, 583 So. 2d 26, 27 (La. Ct. App. 5th Cir. 1991); *see also Moll v. Brown & Root Inc.*, 218 F.3d 472, 476 (5th Cir. 2000) (discussing *Dugas*). As a renovation to a home, the installation of the Slate 2.0 roof is subject to § 9:2772. *See, e.g.*, *Celebration Church, Inc., v. Church Mutual Ins. Co.*, 216 So. 3d 1059, 1061-63 (La. Ct. App. 5th Cir. 2016) (applying § 9:2772 to claims arising from a contractor's alleged failure to properly repair and replace a roof).

Koerner also alleges that "[h]e was solicited by CMR to purchase a roof, not to purchase installation or repair services," and thus the 2005 contract with CMR was a contract for sale.[15] Despite Koerner's contention, however, the record clearly demonstrates—and Koerner admits—that CMR provided both materials and installation services pursuant to the 2005 contract.[16] Indeed, many of Koerner's claims against CMR derive from CMR's alleged faulty installation work.

---

[14] R. Doc. No. 81-3, at 6.
[15] R. Doc. No. 85, at 16.
[16] *See* R. Doc. No. 24, ¶ 7 (second amended complaint) ("CMR both sold and installed the Slate 2.0 roof system on [Koerner's] home.").

In other words, Koerner did not simply buy slate tiles; he bought the installation of a new roof for his Jackson Avenue house, which is an improvement on an immovable as a matter of law. *Cf. Vicari v. Window World, Inc.*, 171 So. 3d 425, 433 (La. Ct. App. 5th Cir. 2015) ("[T]he object of the Vicari contract was not to simply sell forty-five windows to the Vicaris, but to install those windows in their home. To suggest that the Vicaris' only desire in contracting with Window World was to purchase forty-five custom windows to be delivered and set aside at their home, is illogical. The installation was not incidental to the sale, . . . it was the object of the contract."). The 2005 contract is a construction contract and so § 9:2772 applies to claims arising from it.

In addition to claims arising from the 2005 contract, Koerner also asserts claims against CMR arising from subsequent repair work performed on the roof in 2006, 2007, 2011, and 2012.[17] CMR argues that such claims are also governed by § 9:2772's preemptive period.[18] The Court agrees. *See Celebration Church*, 216 So. 3d at 1061-63 (treating roof repairs as covered by § 9:2772); *cf. Vicari*, 171 So. 3d at 436 (same for claims arising from repairs to previously installed windows); *but cf. Chaisson v. Avondale Indus., Inc.*, 947 So. 2d 171, 196 (La. Ct. App. 4th Cir. 2006) (observing that "no Louisiana appellate court" had yet to hold that the particular "type of asbestos repair and maintenance work" at issue fell within the purview of § 9:2772).

---

[17] *See* R. Doc. No. 85-1, at 14-19. In his second amended complaint, Koerner alleges that repair work was performed in 2008, not 2007. *See* R. Doc. No. 24, ¶ 8. However, Koerner later clarifies that 2007 is the correct year. *See* R. Doc. No. 85-2, at 14.
[18] *See* R. Doc. No. 81-3, at 9.

# C.

Next, the Court must determine which, if any, of Koerner's claims are perempted under § 9:2772(A). Under the "clear and specific" language of § 9:2772, *Celebration Church*, 216 So. 3d at 1062, the five-year peremptive period for claims arising from construction work runs either 1) from "the date of registry of the acceptance in the mortgage office of the work by the owner," or 2) if the owner does not register his acceptance "within six months from the date the owner has occupied or taken possession of the improvement, in whole or in part," from the date that "the improvement has been thus occupied by the owner," La. R.S. § 9:2772(A)(1). In this case, neither party argues that Koerner registered CMR's roof work.

Koerner first asserted claims against CMR arising from CMR's roof work on November 14, 2016.[19] Under § 9:2772(A), then, any claims arising from "improvement[s]" that Koerner "occupied" *prior* to November 14, 2011, would fall outside the required five-year window and be perempted.

The parties do not dispute that CMR's removal of his old roof and installation of the Slate 2.0 roof, as well as the repair work in 2006 and 2007, all constitute improvements that Koerner occupied well before November 14, 2011.[20] Any claims arising from these jobs are therefore perempted under § 9:2772(A). Likewise, the

---

[19] *See* R. Doc. No. 24 (second amended complaint).
[20] *See* R. Doc. No. 85-1, at 13-14; R. Doc. No. 85-2, at 13 ("I returned to New Orleans on or about September 23, 2005 and regained and maintained access to the Property continuously since that time.").

parties do not dispute that claims arising from repair work performed by CMR in 2012 are not perempted under § 9:2772(A).[21]

The parties do dispute, however, whether claims arising from roof repairs performed by CMR in late 2011 are perempted. CMR contends that these roof repairs were completed by November 10, 2011.[22] On the other hand, Koerner—"based on [his] understanding"—suggests that those specific repairs were part of a larger remedial project that was not completed until November 2012.[23]

Upon closer examination, the record belies Koerner's belief that the repairs that CMR completed by November 10, 2011, were part of one continuous project that did not come to fruition until November 2012. CMR's job report documenting the 2011 repairs lists the job as "Closed" on November 10, 2011.[24] CMR next agreed to do work for Koerner approximately three months later, in early February 2012, when Koerner entered into an agreement with CMR to do a discrete repair project.[25] CMR performed additional repair work for Koerner between late February and July 2012.[26] Finally, in October 2012, Koerner entered into an agreement with a third party—not CMR—to undertake certain repairs.[27]

---

[21] *See* R. Doc. No. 81-3, at 8-9; R. Doc. No. 85, at 18-21.
[22] *See* R. Doc. No. 81-1, at 7; R. Doc. No. 85-1, at 15.
[23] *See* R. Doc. No. 81-2, at 24; R. Doc. No. 85-2, at 15 (contending that CMR "began doing that work in 2011 but, based on my understanding, did not complete that work until November 2012").
[24] *See* R. Doc. No. 81-2, at 24.
[25] *See id.* at 25.
[26] *See id.* at 26.
[27] *See id.* at 36-38.

"When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007). There is no genuine dispute that the repair work performed in 2011 amounts to an "improvement" distinct from the repair work performed in 2012, and that Koerner "occupied" this "improvement" at the time of its completion.[28] As such, claims arising from CMR's 2011 repair work are perempted under § 9:2772(A).

## IV.

### A.

While § 9:2772(A) applies to many of Koerner's claims, the Court's analysis is not at an end because Koerner contends that he is able to escape this preemptive period by way of § 9:2772(H).[29] Under this subsection, "[t]he peremptive period provided by [§ 9:2772(A)] shall not apply to an action to recover on a contract or to recover damages against any person . . . whose fraud has caused the breach of contract or damages sued upon." La. R.S. § 9:2772(H)(1). For § 9:2772(H)(1) to apply, the breach or damages must in fact be *caused* by fraud; where damages are a result of alleged deficient work, for example, then fraud did not *cause* the damages. *See Thrasher Const.*, 197 So. 3d at 293.

The term "fraud" as used in § 9:2772 has "the same meaning as provided in Civil Code Article 1953." La. R.S. § 9:2772(H)(3). Article 1953 defines "fraud" as "a

---

[28] *See* R. Doc. No. 85-2, at 13.
[29] *See* R. Doc. No. 85, at 7-9.

misrepresentation or a suppression of the truth made with the intention either to obtain an unjust advantage for one party or to cause a loss or inconvenience to the other."  This article further clarifies that fraud may result from either silence or a failure to act.  La. Civ. C. art. 1953.

To establish fraud involving a contract, a plaintiff must show "(1) a misrepresentation, suppression, or omission of true information; (2) the intent to obtain an unjust advantage or to cause damage or inconvenience to another; and (3) the error induced by a fraudulent act must relate to a circumstance substantially influencing the victim's consent to (a cause of) the contract." *Shelton v. Standard / 700 Associates*, 798 So. 2d 60, 64 (La. 2001).  Evidence is "sufficient to support an inference of fraudulent intent if [it] either '(1) show[s] a defendant's motive to commit [ ] fraud or (2) identif[ies] circumstances that indicate conscious behavior on the part of the defendant.'" *Cargill, Inc. v. Degesch Am., Inc.*, 875 F. Supp. 2d 667, 675 (E.D. La. 2012) (quoting *Herrmann Holdings Ltd. v. Lucent Techs. Inc.*, 302 F.3d 552, 565 (5th Cir. 2002)) (alternation in original).

Fraud will not nullify contractual consent "when the party against whom the fraud was directed could have ascertained the truth without difficulty, inconvenience, or special skill," unless "a relation of confidence has reasonably induced a party to rely on the other's assertions or representations."  La. Civ. C. art. 1954; *see also Cashman Equip. Corp. v. Acadian Shipyard, Inc.*, 66 Fed. App'x 524 (5th Cir. 2003) (per curiam) (discussing and applying La. Civ. C. art. 1954).  A "relation of confidence has been found to exist where there is a long-standing and close relationship between the parties due to numerous transactions." *Sepulvado v. Procell*, 99 So. 3d 1129, 1137

(La. Ct. App. 3rd Cir. 2012). The required "confidante/trustee relationship is less likely to exist between parties to a single or limited business transaction." *Id.* at 1137-38.

"[P]laintiffs must state all allegations of fraud with particularity by identifying the time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what that person obtained thereby." *Owens v. Jastrow*, 789 F.3d 529, 535 (5th Cir. 2015) (internal quotation marks omitted); *see also* Fed. R. Civ. P. 9(b); *Williams v. WMX Tech., Inc.*, 112 F.3d 175, 177 (5th Cir. 1997) ("We see no principled reason why the state claims of fraud should escape the pleading requirements of the federal rules . . . ."). Further, plaintiffs must state "the specifics of the false representation." *United States ex rel. Grubbs v. Kanneganti*, 565 F.3d 180, 188-89 (5th Cir. 2009).

"Fraud need only be proven by a preponderance of the evidence and may be established by circumstantial evidence." *Lomont*, 172 So. 3d at 629. Such evidence may include "highly suspicious facts and circumstances." *Id.*

## B.

The Court must first consider if a genuine dispute of material fact exists as to whether fraud caused any of the damages upon which Koerner is suing.

Koerner alleges that CMR misrepresented the nature of the product that he was purchasing, *i.e.*, that a Slate 2.0 roof was a "traditional slate roof," that a Slate 2.0 roof would "outlast" Koerner, and that a Slate 2.0 roof was backed by a 75-year

warranty.[30]  Koerner also alleges that CMR did not properly remove the old roof from the Jackson Avenue house, that CMR did not properly install the Slate 2.0 roof, and that CMR did not properly repair the Slate 2.0 roof's deficiencies after installation.[31] As a result, Koerner argues that he did not receive the roof that he wanted and that his house sustained damage from CMR's work.

To the extent that Koerner asserts claims against CMR for physical damage resulting from the removal of his old roof, the installation of the Slate 2.0 roof, and subsequent repair work in 2006, 2007, and 2011—all jobs performed and completed by CMR before November 14, 2011—there is no genuine material dispute that fraud did not *cause* the damages.  Rather, the quality of CMR's work—alleged to be deficient—is to blame.  *See Thrasher Const.*, 197 So. 3d at 293.  Koerner cannot salvage claims arising from the alleged substandard quality of CMR's work by relying on the § 9:2772(H) fraud exception and so such claims are perempted.  Thus, all claims arising from CMR's repair work in 2006, 2007, and 2011 are perempted and will be dismissed.

On the other hand, Koerner's claims arising from his *purchase* of the Slate 2.0 roof from CMR *may* qualify for the § 9:2772(H) exception.  With respect to the purchase, the "damages sued upon"—purchasing one product under false pretenses— *could* have been caused by fraud.  La. R.S. § 9:2772(H)(1).

CMR argues that Koerner cannot prove that his purchase of the Slate 2.0 roof was caused by any fraud on the part of CMR.  CMR points out that its agent provided

―――――――――――――
[30] *See id.* at 2.
[31] *See id.* at 3-5.

Koerner with product literature,[32] and that the 2005 contract between CMR and Koerner explicitly provided for a Slate 2.0 roof.[33]  Further, the 2005 contract does not mention a 75-year warranty and explicitly notes, after listing 10-year workmanship and materials warranties, that "THERE ARE NO OTHER WARRANTIES EXPRESS OR IMPLIED, AND THERE IS NO IMPLIED WARRANTY OF MERCHANTABILITY."[34]  To CMR, Koerner's assertion that fraudulent behavior by CMR led to his purchase of the Slate 2.0 roof is "devoid of factual support."[35]

Koerner's only evidence that fraud caused him to purchase the Slate 2.0 roof is his own unsworn declaration under penalty of perjury,[36] in which Koerner details his interactions with the CMR agent with whom he dealt to purchase the roof.[37] According to Koerner, "I made it clear to CMR's salesman that I wanted to purchase a traditional slate roof to maintain the historic character of my home."[38]  Koerner goes on to allege that:

> CMR conveyed to me that the Slate 2.0 roof was a new and improved version of a traditional slate roof (which roof still possessed all of the attributes of a traditional slate roof but was better in every meaningful way), was the best slate roof available to be purchased anywhere, that its warranty of 75 years was longer than the life of other slate roofs, and that I was paying a premium over the cost of [ ] other slate roofs in order to purchase a Slate 2.0 roof.  I believed this, or I would not have

---

[32] *See* R. Doc. No. 85-2, at 1.
[33] *See* R. Doc. No. 81-2, at 9.
[34] *Id.* at 10.  The 2005 contract further provides: "This Agreement contains the entire Agreement between the Homeowner and CMR.  This Agreement supersedes all other written and/or oral Agreements."  *Id.*
[35] R. Doc. No. 81-3, at 11.
[36] *See* 28 U.S.C. § 1746.
[37] *See* R. Doc. No. 85-2, at 1-9.
[38] *Id.* at 4.

purchased it and spend [sic] over $90,000 for an inferior or otherwise second-class roof. [39]

. . .

I did not know that I was buying a roof with a synthetic membrane beneath slate tiles. Had I known this, I would not have bought this roof from CMR. . . . I was not shown physical samples of the Slate 2.0 roofing system, although the salesman may have had samples of the slate which would have appeared . . . to be real slate and apparently is.[40]

In the same unsworn declaration, however, Koerner acknowledges—as CMR points out—that he received product literature from CRM's agent at the time that he purchased the Slate 2.0 roof.[41] Further, Koerner admits that he knew at the time that CMR was not using felt on his roof.[42] Specifically, Koerner alleges that he "understood that instead of felt CMR was installing some kind of advanced underlayment."[43]

Koerner's allegations of fraud do not survive CMR's motion for summary judgment. As the Court previously explained, "plaintiffs must state all allegations of fraud with particularity, including by identifying the time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what that person obtained thereby." *Owens*, 789 F.3d at 535. "[I]n many cases, the failure to state a claim is the 'functional equivalent' of the failure to raise a genuine issue of material fact." *Whalen v. Carter*, 954 F.2d 1087, 1098 (5th

---

[39] *Id.* at 6.
[40] *Id.* at 8-9.
[41] *Id.* at 1.
[42] *See id.* at 10.
[43] *Id.*

Cir. 1992); *see also id.* at 1097-98 (applying the pleading requirements for fraud claims on a motion for summary judgment). Such is the case here.

Nowhere in his unsworn declaration or any other filing, including his complaint, does Koerner identify when or where CMR's agent made the allegedly fraudulent statements. *Cf. Webb v. Everhome Mortgage*, No. 17-10243, 2017 WL 3121983, at *2 (5th Cir. 2017) (per curiam) (affirming a district court's dismissal of a fraud claim because the amended complaint did not allege, *inter alia*, when or where the allegedly fraudulent statements were made). Koerner's allegations of fraud are legally insufficient on this basis.

Moreover, by Koerner's own account, CMR represented to Koerner that the Slate 2.0 roof shared "all of the attributes of a traditional slate roof"[44]—*not* that it *was* a "traditional slate roof." Koerner also acknowledges that he was aware that CMR was not installing felt underneath the slate tiles.[45] Further, the 2005 contract does not include a 75-year warranty and expressly disclaims all warranties not listed.[46] Without evidence of "a misrepresentation, suppression, or omission of true information" by CMR, Koerner cannot sustain allegations of fraud. *Shelton*, 798 So. 2d at 64.

The record is likewise devoid of any evidence "that invite[s] an inference of fraudulent intent" on the part of CMR, another shortcoming fatal to Koerner's fraud allegations. *Cargill*, 875 F. Supp. 2d at 675. While evidence of motive can support

---

[44] *Id.* at 6.
[45] *See id.* at 10.
[46] R. Doc. No. 81-2, at 10.

such an inference, Koerner "do[es] not sufficiently allege[, let alone prove,] motive by making generic allegations that [CMR] had a financial interest in carrying out the alleged fraud"—in this case, selling Koerner a roof. *Id.* at 675-76 (citation and internal quotation marks omitted).

Lastly, the Court observes that Koerner presumably could have "ascertained the truth" about the Slate 2.0 roof that he was purchasing—assuming that he did not know it—"without difficulty, inconvenience, or special skill." La. Civ. C. 1954. Koerner admits that he believed the representations made by CMR's agent about the Slate 2.0 roof,[47] but no facts presented to the Court suggest that Koerner and the agent had a "relation of confidence" such that Koerner should have unquestionably "rel[ied] on the other's assertions or representations." *Id.*; *see also Sepulvado*, 99 So. 3d at 1137; *cf. Hawes v. Kilpatrick Funeral Homes*, Inc., 887 So. 2d 711, 715 (La. Ct. App. 2d Cir. 2004) ("The mere fact that [the funeral home branch manager] possessed more expertise regarding the funeral home industry did not create a relationship of trust between the parties."); *C.J. Calamia Constr. Co., Inc. v. Ardco/Traverse Lift Co., L.L.C.*, No. 97-2779, 1998 WL 638368, at *2 n.2 (E.D. La. Sept. 15, 1998) (Clement, J.) ("Calamia and ARDCO did not have the type of relationship that would be included under [the La. Civ. C. art. 1954 'relation of confidence'] exception. The Calamia/ARDCO relationship merely consisted of a *single sales contract*." (emphasis added)).

---

[47] *See* R. Doc. No. 85-2, at 6.

In the end, Koerner is displeased with the product that he purchased and he is attempting to revive his long-perempted claims against CMR via § 9:2772's fraud exception. Koerner is out of luck. "[E]ven in cases where elusive concepts such as motive or intent are at issue," summary judgment may be appropriate "if the nonmoving party rests merely upon conclusory allegations, improbable inferences, and unsupported speculation." *Forsyth v. Barr*, 19 F.3d 1527, 1533 (5th Cir. 1994) (internal quotation marks omitted). This is one of those cases. All of Koerner's claims related to the purchase of the Slate 2.0 roof are therefore perempted and will be dismissed.

## V.

With respect to CMR's 2012 repairs of his Jackson Avenue house roof, Koerner brings claims for negligence, detrimental reliance, and fraud. CMR challenges all of these claims.

## A.

A negligence claim under Louisiana law "is properly examined under the duty-risk analysis." *Daye v. General Motors Corp.*, 720 So. 2d 654, 660 (La. 1998). This analytical framework requires a plaintiff to show "that the conduct in question was a cause-in-fact of the resulting harm, the defendant owed a duty of care to the plaintiff, the requisite duty was breached by the defendant and the risk of harm was within the scope of protection afforded by the duty breached." *Syrie v. Schilhab*, 693 So. 2d 1173, 1176-77 (La. 1997). "A negative answer to any of the inquiries of the duty-risk analysis results in a determination of no liability." *Daye*, 720 So. 2d at 660.

CMR argues that there is no genuine dispute that Koerner's damages related to the 2012 repairs do not arise from the repairs at all, but rather from CMR's alleged faulty installation of the Slate 2.0 roof in 2005 and 2006.[48] To support this argument, CMR points to an affidavit[49] by Koerner's construction expert, Louis Relle, Jr. ("Relle"), which Koerner attached to his prior motion for default judgment.[50] CMR reads Relle's allegations in the affidavit as addressing only damage caused by the roof's installation, not additional damage caused by CMR's repair work.

CMR also argues that Relle "wrongly attribute[s] an obligation to CMR to repair any and all issues that may have existed at the time of the repair work, whether or not such issues were even known to CMR at the time."[51] Finally, CMR argues that "Relle does not attribute any such leaks to repair work by CMR."[52] Instead, CMR contends that an independent third party performed the repair work that Koerner now complains was inadequate.[53]

Koerner attempts to identify a genuine dispute of material fact by pointing not to Relle's affidavit, but instead to Relle's more recent supplemental expert report, in which Relle outlines the damage to the Jackson Avenue house allegedly caused by CMR's roof work.[54] Specifically, Relle links the damage that he identifies to "CMR

---

[48] *See* R. Doc. No. 81-3, at 8-9.
[49] R. Doc. No. 37-3.
[50] R. Doc. No. 37.
[51] R. Doc. No. 88, at 10.
[52] R. Doc. No. 81-3, at 9.
[53] *See* R. Doc. No. 81-1, at 8-9; R. Doc. No. 81-3, at 8 and n.44 (noting that the last repairs performed by CMR on the Jackson Avenue house roof were in early 2012); R. Doc. No. 88, at 9.
[54] *See* R. Doc. No. 85, at 19-20 (discussing R. Doc. No. 85-5, at 61-68).

not following the installation instructions during the original installation" of the Slate 2.0 roof and CMR "failing to correct the known defects [with the Jackson Avenue house roof] when it performed the *last* of its repairs in 2012."[55]

The "last" repairs that Relle attributes to CMR are repairs performed in November 2012.[56] Thus, based on Relle's report—on which Koerner relies—Koerner's claims related to the 2012 repairs concern only the November 2012 repairs, as Relle points only to those repairs as a cause of damage to Koerner.

Yet CMR argues that the November 2012 repairs were performed by a third party, not itself. Koerner disagrees, insisting in his unsworn declaration that the third party "was CMR's own contractor."[57] Despite Koerner's insistence, however, the record before the Court does not permit such a finding.

Under Louisiana law, a party must prove *all* of the following to establish the existence of a principal/independent contractor relationship:

1) there is a valid contract between the parties;

2) the work being done is of an independent nature such that the contractor may employ non-exclusive means in accomplishing it;

3) the contract calls for specific piecework as a unit to be done according to the independent contractor's own methods without being subject to the control and direction of the principal, except as to the result of the services to be rendered;

4) there is a specific price for the overall undertaking; *and*

5) specific time or duration is agreed upon and not subject to termination at the will of either side without liability for breach.

---

[55] R. Doc. No. 85-5, at 64 (emphasis added).

[56] *See id.* at 63 ("CMR agreed that there were installation defects and, in November of 2012 . . . agreed to undertake and complete numerous repairs.").

[57] R. Doc. No. 85-2, at 18.

*Bourquard v. L.O. Ausauma Enter., Inc.*, 52 So. 3d 248, 253 (La. Ct. App. 4th Cir. 2010) (emphasis added). In this case, the agreement covering the November 2012 repairs (the "2012 agreement")[58]—dated October 21, 2012—does state that a CMR employee asked the third party "to inspect and, if appropriate, repair . . . damage to the roof and flashing of the roof" of the Jackson Avenue house.[59] However, the 2012 agreement is directly between Koerner and the third party; CMR is not a party to it. In fact, the record is devoid of evidence of *any* contract between CMR and the third party.

Further, in an email dated October 16, 2012—sent five days *before* the execution of the 2012 agreement—CMR's president informed Koerner that this third party "does not represent CMR in any way" and that he did not even know the third party.[60] (Koerner directly responded to this email.[61]) In another email to CMR's president sent on the day that the 2012 agreement was executed, Koerner himself acknowledges that he "made a deal" with the third party.[62]

While it appears that CMR paid for a portion of the third party's work on the Jackson Avenue house roof,[63] that payment does not convert the third party into CMR's contractor. *See id.* If anything, the record supports a finding that the third party was *Koerner's* contractor, *not* CMR's. *See id.* ("An independent contractor

---

[58] *See* R. Doc. No. 81-2, at 36-38.
[59] *Id.* at 36.
[60] *Id.* at 29.
[61] *Id.* at 28-29.
[62] *Id.* at 28.
[63] *See id.* at 28, 39.

relationship exists when," among other things, "there is a valid contract between the parties . . . .").

As the Court previously explained, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott*, 550 U.S. at 380. Koerner's assertion that the third party was CMR's contractor is an example of creative lawyering; it is "simply an opinion" and as such "a textbook example of conclusoriness." *Reese v. Anderson*, 926 F.2d 494, 499 (5th Cir. 1991). "What is needed . . . are facts, reasons, observations, and explanations—in a word, *evidence*— not sweeping conclusions." *Id.* (emphasis in original). Based on the record and given the applicable law, there is no genuine dispute that the third party was not CMR's contractor.

Moreover, even assuming that the Court classified the third party as CMR's contractor, generally "[a]s a matter of [Louisiana] law, a principal is not liable for the negligence of an independent contractor." *Burton v. Conoco Offshore, Inc.*, 631 So. 2d 1374, 1376 (La. Ct. App. 5th Cir. 1994). This rule has two exceptions: "[a] principal may not avoid liability for the acts of an independent contractor when the principal reserves the right to supervise or control the contractor's work or when an ultrahazardous activity is involved." *Id.* Koerner points to no evidence that CMR "reserve[d] the right to supervise or control the contractor's work," or that repairing the Jackson Avenue house roof constituted an "ultrahazardous activity." *Id.*; *see also Sims v. Cefolia*, 890 So. 2d 626, 631-32 (La. Ct. App. 5th Cir. 2004) (defining

ultrahazardous activities); *Burton*, 631 So. 2d at 1377 (applying the three-prong test developed by the U.S. Court of Appeals for the Fifth Circuit in *Perkins v. F.I.E. Corp.*, 762 F.2d 1250 (5th Cir. 1985), to determine whether a particular activity is ultrahazardous).

Koerner simply alleges in his unsworn declaration that "the work was reviewed and verified as complete by CMR."[64] Yet "[m]ere inspection of the work done by an independent contractor and direction as to the final results of the project is insufficient to support a conclusion that the principal has retained enough control over the project" to be liable for the independent contractor's negligence. *Nippa v. Chevron, USA*, 774 So. 2d 310, 315 (La. Ct. App. 4th Cir. 2000).

In a nutshell, Koerner's claim for negligence concerns only the November 2012 repairs, which was performed by a third party, not CMR. In this case, CMR cannot be held legally responsible for the alleged negligence of this third party. Koerner's negligence claim related to the November 2012 repairs will be dismissed.

## B.

To establish detrimental reliance pursuant to Article 1967 of the Louisiana Civil Code, "a party must prove the following by a preponderance of the evidence: (1) a representation by conduct or word; (2) made in such a manner that the promisor should have expected the promisee to rely upon it; (3) justifiable reliance by the promisee; and (4) a change in position to the promisee's detriment because of the reliance." *In re Ark-La-Tex Timber Co., Inc.*, 482 F.3d 319, 334 (5th Cir. 2007) (citing

---

[64] R. Doc. No. 85-2, at 17.

*Suire v. Lafayette City-Parish Consolidated Gov't*, 907 So. 2d 37, 59 (La. 2005)). "Louisiana law does not require proof of a formal, valid, and enforceable contract" between parties to assert a detrimental reliance claim. *Suire*, 907 So. 2d at 59. However, the party asserting the claim must show that the representation that is the basis for the claim amounted to a *promise. See Roxco Ltd. v. Harris Specialty Chem., Inc.*, 85 Fed. App'x 375, 378 (5th Cir. 2004) (noting that Article 1967 "requires the representations to be promises"); *Wooley v. Lucksinger*, 961 So. 2d 1228, 1238 (La. Ct. App. 1st Cir. 2007) ("The first element of proof of the Article 1967 detrimental reliance cause of action is that a promise was given by the defendant to the plaintiff."). "Recovery under detrimental reliance is difficult, because estoppel is not favored in [Louisiana] law." *Allbritton v. Lincoln Health Sys., Inc.*, 51 So. 3d 91, 95 (La. Ct. App. 2d Cir. 2010).

With respect to Koerner's detrimental reliance claim related to the November 2012 repairs to the Jackson Avenue house roof, CMR argues that a third party performed those repairs pursuant to an agreement directly between Koerner and that third party.[65] As such, "no merit lies in any contention that CMR allegedly misled Koerner about the scope or effect of repairs," because CMR did not provide the repairs.[66]

To support his detrimental reliance claim, Koerner argues that CMR made a representation to him regarding "the completeness of [the November 2012] repairs."[67]

---

[65] *See* R. Doc. No. 81-3, at 8 & n. 44.
[66] *Id.* at 10.
[67] R. Doc. No. 85, at 19.

More specifically, Koerner contends that CMR "reviewed and verified as complete" the repairs provided by the third party, and made "assurances that this work would address the remaining issues with his roof."[68]  Based on this representation, Koerner contends that he "believed that all issues with [the] roof"—in particular, those issues identified in a January 2011 roof inspection report by Guaranty Sheet Metal and Roofing ("2011 inspection report")[69]—"had been addressed," but in fact "all issues" were not.[70]

Like his negligence claim, Koerner's claim for detrimental reliance fails.  In order to state a detrimental reliance claim, Koerner must first allege that CMR made a promise to him.  *See Roxco*, 85 Fed. App'x at 378.  In this context, a promise is "[t]he manifestation of an intention to act or refrain from acting in a specified manner, conveyed in such a way that another is justified in understanding that a commitment has been made." *Wooley*, 961 So. 2d at 1239 (quoting *Promise*, Black's Law Dictionary 1228-29 (7th ed. 1999)) (internal quotation marks omitted); *see In re Katrina Canal Breaches Litig.*, 495 F.3d at 210 (noting that dictionaries "are helpful resources in ascertaining a term's generally prevailing meaning"); *Gregor v. Argenot Great Cent. Ins. Co.*, 851 So. 2d 959, 964 (La. 2003) ("Dictionaries are a valuable source for determining the 'common and approved usage" of words."").  In other words, a promise

---

[68] R. Doc. No. 85-2, at 17; *see also* R. Doc. No. 85, at 19; R. Doc. No. 24, at 4.
[69] *See* R. Doc. No. 81-2, at 11-16.
[70] R. Doc. No. 85-2, at 19.

amounts to "a person's *assurance* that the person will or will not do something." *Id.* (citation and internal quotation marks omitted) (emphasis in original).[71]

The alleged representation by CMR at the heart of Koerner's detrimental reliance claim is that CMR reviewed the third party's remedial work on the Jackson Avenue house roof, verified the work as complete, and assured Koerner that this work would fix the problems with the roof. Yet this representation is not a promise: it does not constitute an assurance by CMR to do any particular thing, or not do any particular thing, for Koerner. With a promise given to him by CMR, Koerner has not stated a detrimental reliance claim against CMR.

Moreover, even if CMR's representation constituted a promise, "reliance on the representation must be reasonable," meaning the representation "must not be vague and plaintiff's reliance cannot simply be based on assumption." *Bernard v. Scott Liti. Grp.*, No. 16-1314, 2017 WL 819036, at *4 (E.D. La. Mar. 2, 2017) (Morgan, J.) (citation and internal quotation marks omitted); *see also Bensco One, LLC v. Volkswagen of Am., Inc.*, No. 06-1591, 2008 WL 907521, at *11 (E.D. La. Mar. 31, 2008) (Porteous, J.) ("Assumptions based merely upon vague promises are insufficient to support a [detrimental reliance] claim."). Koerner alleges that CMR attested to the "completeness" of the third party's repair work: that CMR "reviewed and verified [the third party's work] as complete," and assured him "that this work would address

---

[71] In addition to Black's Law Dictionary, the Louisiana First Circuit Court of Appeal in *Woolsey* also looked to the definitions of "promise" offered in Miriam-Webster's Collegiate Dictionary (10th ed. 1993) and the Civil Jury Instructions (2d ed.) in volume 18 of the Louisiana Civil Law Treatise series. *See* 961 So.2d at 1239.

the remaining issues with his roof."[72] Koerner appears to assume that CMR's representation that the third party had completed its work amounted to a guarantee as to the *quality* of the work.[73] Yet there is substantial difference between a verification that work is *complete* and a pledge that work is *correct*. Koerner's assumption—which appears wholly unjustified by the representation, as characterized by Koerner—precludes the inference that Koerner's alleged reliance on the representation was reasonable.

Further, as previously discussed and despite Koerner's insistence to the contrary, the record demonstrates that CMR did not perform the November 2012 repairs. The 2012 agreement was directly between Koerner and the third party; CMR was not a party to the 2012 agreement, did not provide the work, and was not legally responsible for the finished product. *See Nippa*, 774 So. 2d at 315. As such, the record precludes the inference that CMR would have expected Koerner to rely on any representation concerning the correctness or comprehensiveness of the third party's repairs, and any reliance on Koerner's part was unreasonable.

What Koerner is attempting to do is hold CMR liable for the third party's alleged negligent repairs. The Court has already explained that CMR is not liable for the third party's negligence, and the Court will not allow Koerner to escape this conclusion by transforming his negligence claim into a claim for detrimental reliance. The Court will therefore dismiss the detrimental reliance claim.

## C.

---

[72] R. Doc. No. 85-2, at 17; *see also* R. Doc. No. 85, at 19; R. Doc. No. 24, at 4.
[73] *See* R. Doc. No. 85-2, at 17.

Lastly, Koerner asserts a fraud claim related to the 2012 repair work performed on the Jackson Avenue house roof. "To recover under a cause of action in delictual fraud, a plaintiff must prove three elements: (1) a misrepresentation of material fact, (2) made with the intent to deceive, (3) causing justifiable reliance with resultant injury." *Becnel v. Grodner*, 982 So. 2d 891, 894 (La. Ct. App. 4th Cir. 2008) (citing *Newport Ltd. v. Sears Roebuck & Co.*, 6 F.3d 1058, 1068 (5th Cir. 1993)). CMR contends this fraud claim is too vague to survive summary judgment.[74]

Koerner alleges in his complaint that "CMR did perform extensive repairs to his roof in late November 2012"—the Court has concluded that CMR did not—and that "CMR intentionally misrepresented to [him] that these repairs would address the issues that he was having with his roof."[75] In his unsworn declaration, Koerner further contends that a CMR employee allegedly assured him that the 2012 repairs would "correct all defects in the roof that had been identified" in the 2011 inspection report and that this assurance proved false.[76]

Koerner also points to a September 10, 2011, email that a CMR superintendent sent to his colleagues after inspecting the Jackson Avenue house roof.[77] In the email, the CMR superintendent states that "I did not disclose or offer any info on my findings [to Koerner] and simply left [Koerner] assured we were working on correcting his leak issue, after all he is a lawyer and I know they are sneaky :)."[78] Koerner argues that

---

[74] *See* R. Doc. No. 81-3, at 14.
[75] R. Doc. No. 66, ¶¶ 46-47.
[76] R. Doc. No. 85-2, at 16.
[77] *Id.* at 27.
[78] *Id.* (emoticon in original).

the email "confirms" that "CMR was well aware of the defects in his home, kept that information from him, assured him that it would correct the problems, and deliberately failed to do so."[79]

To the extent that Koerner bases his fraud claim on an alleged representation by CMR to address all of the issues with the Jackson Avenue house roof identified in the 2011 inspection report, the claim suffers from the same lack of specificity that doomed his allegations of fraud related to his purchase of the Slate 2.0 roof. Koerner does not identify the CMR employee who made this specific representation to him, nor does he identify when or where the representation was made. *See Owens*, 789 F.3d at 535. Insofar as the September 10, 2011, email mentions the 2011 inspection report at all, it simply notes that Koerner "stated [to the CMR superintendent] that last January he had another roofing company quote these repairs and said he sent to us what they suggested."[80] The email does not indicate that the CMR superintendent even saw the 2011 inspection report, let alone that he made any assurances to Koerner related to the report. Thus, the email does nothing to cure Koerner's particularity problem.

Further, to the extent that Koerner bases his fraud claim on the representation by the CMR superintendent that CMR would "correct[ ]" the "leak issue," the claim likewise fails. First, CMR addressed this "leak issue" with discrete repairs that CMR performed on the roof in fall 2011.[81] The Court has already concluded that this repair

---

[79] R. Doc. No. 85, at 4.
[80] R. Doc. No. 85-2, at 27.
[81] *See* R. Doc. No. 81-2, at 24.

work is separate and independent from repairs performed in 2012, and that claims arising from this repair work are perempted under La. R.S. § 9:2772(A).

Second, while fraud can be predicated "on promises made with the intention not to perform at the time the promise is made," the "[f]ailure to perform as promised, or nonperformance of an agreement to do something at a future time . . . is alone not evidence of fraud" under Louisiana law. *Peaker Energy Grp., LLC v. Cargill, Inc.*, No. 14-2106, 2015 WL 4879415, at *11 (E.D. La. Aug. 14, 2015) (Engelhardt, J.) (quoting *Benton v. Clay*, 123 So.3d 212, 219 (La. Ct. App. 2d Cir. 2013)). The email does not indicate that CMR did not intend to honor its assurances to Koerner that it would address the Jackson Avenue house roof's leak problem. To the contrary, and as just mentioned, CMR *did* conduct repairs on the roof soon after the CMR employee's inspection.[82]

Koerner's emphasis on the CMR superintendent's admitted decision not to disclose the results of his inspection to Koerner is ultimately misplaced. The email only shows that the CMR superintendent did not disclose those results because lawyers are "sneaky," not because the CMR superintendent never intended that CMR would address the "leak issue." The former is not equivalent to the latter.

Koerner's fraud claim related to the 2012 repairs will be dismissed.

## VI.

As the Court has already dismissed Koerner's fraud claims on other grounds, the Court need not address the issue of prescription.

---

[82] *See id.*

Accordingly,

**IT IS ORDERED** that the motion for summary judgment is **GRANTED** and that all of Koerner's claims against CMR are **DISMISSED WITH PREJUDICE**.

New Orleans, Louisiana, October 18, 2017.

_____
**LANCE M. AFRICK**
**UNITED STATES DISTRICT JUDGE**